UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                        Plaintiff,<br><br>     v.<br><br>KEVIN P. O'BRIEN,<br><br>                        Defendant. | Civil Action No. 14-cv-169<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1. This matter involves violations of the anti-fraud provisions of the federal securities laws by Kevin O'Brien (O'Brien"), who formerly worked as a financial adviser in Cincinnati, Ohio.

2. From at least 1998 through 2008, while working as a registered representative at R.W. Baird & Co., Inc. ("Baird"), O'Brien engaged in a fraudulent scheme, misappropriating over $298,000 from a customer. In carrying out this scheme, O'Brien periodically caused checks to be issued from the customer's account, had the checks mailed to a post office box in the customer's name that O'Brien controlled in Kentucky, picked up the checks and deposited them into a bank account in the customer's name that O'Brien also controlled, and then wrote checks to himself and a charity he controlled, and also withdrew money from the account using automatic teller machines. O'Brien used the money for personal expenses unrelated to the customer.

1

3. By engaging in such conduct, O'Brien violated, and unless enjoined might continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

4. The SEC brings this action seeking to permanently enjoin the Defendant from engaging in the wrongful conduct alleged in this Complaint. The SEC also seeks a final judgment ordering disgorgement of ill-gotten gains and prejudgment interest thereon, but waiving payment of disgorgement and prejudgment interest based upon Defendant's representations concerning his financial status. The SEC is not seeking payment of a civil money penalty based upon Defendant's stated inability to pay.

## JURISDICTION AND VENUE

5. This court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 77u(d) and 78aa.

6. Venue in this Court is proper because certain of the transactions, acts, practices and courses of business alleged in this Complaint occurred within the Southern District of Ohio, including O'Brien's causing the sale of securities and then misappropriating the proceeds of those sales.

## DEFENDANT

7. KEVIN P. O'BRIEN, age 57, is a resident of Cincinnati, Ohio.

8. From around November 1987 through September 2008, O'Brien was a registered representative at two broker-dealer firms in Cincinnati, Ohio area: The Ohio

Company (November 1987 - September 1998) and R.W. Baird & Co., Inc. (September 1998 – September 2008).

### THE FRAUD

9. In or around 1990, Customer A[1] opened a brokerage account at The Ohio Company. O'Brien was the registered representative for that account.

10. Customer A had a history of mental health issues. In the mid-1990s, Customer A was hospitalized for an extended period and neglected his property and finances. O'Brien became aware of Customer A's problems and assisted him in getting his financial and residential affairs in order.

11. In July 1998, Customer A executed a durable power-of-attorney, making O'Brien his "attorney in fact" and giving O'Brien broad authority to manage his financial affairs. O'Brien helped Customer A get his house in Kentucky repaired and get current with overdue real estate taxes and utility bills on the house as well as a farm in Kansas that Customer A owned. O'Brien also helped Customer A sell the house and purchase a condominium in suburban Kentucky. Customer A compensated O'Brien for this assistance.

12. In November 1998, Customer A executed another durable power-of-attorney giving O'Brien additional authority. Although the power-of-attorney was broad, O'Brien only had access to the brokerage account for which he was the registered representative.

13. Customer A and O'Brien agreed that O'Brien would oversee the finances for a farm in Kansas that Customer A had inherited. The farm was operated by a tenant farmer

---

[1] For privacy reasons, the Commission is not using the customer's name in the Complaint and refers to the customer only as "Customer A."

and O'Brien was to be paid a reasonable fee for overseeing the finances. This required O'Brien to pay, from Customer A's bank account, a handful of annual bills associated with the farm's operation and to deposit, into Customer A's bank account, the income associated with crop sales.

14. In or around late 1998, O'Brien opened a bank account at PNC in Customer A's name (the "PNC account") over which O'Brien had signatory authority as power-of-attorney. In this account, O'Brien deposited income from the farm, and paid the farm bills. O'Brien also used the PNC account to deposit the checks that he caused to be issued from Customer A's brokerage account without Customer A's authorization.

15. In or around late 1998, O'Brien left the Ohio Company for a position as a registered representative with R.W. Baird in Cincinnati. Customer A closed his account at The Ohio Company and opened a discretionary account at Baird ("the Baird account"), for which O'Brien was registered representative.

16. Customer A opened the Baird account with about $400,000 in assets. From 1998 through 2008, the Baird account value ranged from a high of over $525,000 in 1999 and 2000, to a low of approximately $342,000 at the end of 2008.

17. Although the fluctuations in value of the Baird account were not inconsistent with the general movement of the market during this period, O'Brien caused a total of $298,917 to be withdrawn from the account for his personal benefit from 1998 through 2008.

18. On numerous occasions between 1998 through 2008, O'Brien sold securities in the Baird account and, within days, caused Baird to issue checks from the account payable to Customer A. On other occasions during these years, O'Brien caused

4

checks to be written on Customer A's account, knowing that money market securities would be liquidated in order for the checks to clear.

19. At O'Brien's direction, Baird sent the checks to a P.O. Box in Customer A's name in suburban Kentucky. O'Brien retrieved the checks from the P.O. Box, and deposited them into the PNC account. O'Brien then wrote checks on the PNC account to himself and Parents and Children for Equality ("PACE"), a 501(c)(3) organization that O'Brien established and controlled. O'Brien also used an ATM or debit card to make cash withdrawals from ATMs, and made wire transfers from the PNC account for credit card payments.

20. Customer A did not authorize the withdrawals from the Baird account that were deposited in the PNC Account. O'Brien's subsequent withdrawals from the PNC account did not benefit Customer A in any way.

21. O'Brien caused withdrawals from Customer A's Baird account in every year from 1998 through 2008. O'Brien always had the checks sent to the P.O. Box, and then deposited them into the PNC account. He then wrote checks to PACE or to himself, and used an ATM or debit card to withdraw smaller amounts, i.e., $200-$400.

22. Although O'Brien wrote legitimate checks from Customer A's PNC account to pay bills for the farm owned by Customer A, the farm generated sufficient income to pay the expenses and taxes associated with its operation.

23. O'Brien misappropriated money in every year that the Baird account existed, but made the highest amount of unauthorized withdrawals in 2007 and 2008.

24. Between January 2008 and August 2008, O'Brien directed that checks, totaling $60,000 and payable to Customer A, be issued from the Baird account. By directing

5

that Baird issue these checks, O'Brien either directly sold securities in the account in the days immediately before the check was issued, and/or he caused the sale of money market securities to cover the amount of the check. For example:

   a. On January 2, 2008, O'Brien caused Baird to issue a check for $15,000 payable to Customer A and sent to the P.O. Box. By doing so, O'Brien caused $15,000 in money market securities to be liquidated. On January 4, 2008, after retrieving the check from the P.O. Box, O'Brien deposited the check, via ATM, in the PNC bank account, and withdrew $200 of cash. On the same day, O'Brien wrote a check on the Customer A's PNC account payable to PACE for $5,000. Later in the month, O'Brien wrote a check to himself from the PACE account for $1,400 and made a payment of $2,500 for a personal credit card.

   b. Similarly, in late April 2008, O'Brien sold securities in Customer A's Baird account, with the proceeds being invested in money market securities. Several days later, O'Brien caused a check to be issued to Customer A for $10,000, requiring the liquidation of $10,000 of money market securities. O'Brien diverted the proceeds for his own use.

25. O'Brien engaged in the same pattern of misconduct in prior years, with the exception that, in some years, the majority of money was directed to PACE, which O'Brien utilized as a personal account.

26. Between 1998 and 2008, O'Brien conveyed to PACE over $122,000 from the Baird account by directing that checks be issued to Customer A at the P.O. Box, retrieving the checks and depositing them in the PNC account, and then writing checks from the

account to PACE. Customer A was unaware of PACE, never discussed PACE with O'Brien, and never authorized any contributions to PACE.

27. O'Brien was the only person with access to the PACE bank account. During the period from 2005 and 2008, the PACE account had minimal deposits other than money misappropriated from Customer A. In fact, from 2005-2008, the PACE bank account had total deposits of $69,919.64, and Customer A was responsible for $68,000 of that amount.

28. O'Brien was also, by far, the primary beneficiary of the money from the PACE account. For example, in 2007, Customer A "donated" $31,000 to PACE. During that year, O'Brien wrote checks to himself totaling $14,000, and made an additional $14,500 in electronic payments for a credit card. In the same year, PACE paid $2,400 for storage, $2,000 for telecommunications, and $535 to a warehouse retailer.

29. In addition to having discretionary control over the Baird account and overseeing the operation of Customer A's farm, O'Brien also prepared or directed the preparation of Customer A's tax returns from 1998 through 2007. Upon information and belief, the tax returns neither set forth nor reflected any deductions for the charitable contributions to PACE.

30. In September 2008, Customer A discovered the misappropriations and complained to Baird, which compensated Customer A.

## FIRST CLAIM

31. The SEC realleges and incorporates by reference the allegations contained in Paragraphs 1 through 30, above.

32. Between 1998 and 2008, O'Brien repeatedly sold or caused the sale of his customer's securities with the intent of converting the proceeds, and used the means and instruments of interstate commerce and the mails to carry out this misappropriation. O'Brien concealed his actions by causing his employer to issue checks payable to the customer and then directing the checks via U.S. mail to a post office box that O'Brien controlled. O'Brien deposited the checks into an account over which O'Brien had power of attorney, and then withdrew the proceeds for his own use.

33. By reason of the foregoing, Defendant has violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

34. The SEC realleges and incorporates by reference the allegations contained in Paragraphs 1 through 33, above.

35. Between 1998 and 2008, O'Brien repeatedly sold or caused the sale of a customer's securities with the intent of converting the proceeds. O'Brien employed deceptive devices to misappropriate customer funds and conceal his misappropriation of those funds by causing his employer to issue checks payable to the customer and then directing the checks to a post office box that O'Brien controlled. O'Brien deposited the checks into an account over which he had power of attorney, and then withdrew the proceeds for his own use.

36. By reason of the foregoing, Defendant has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b 5].

## REQUEST FOR RELIEF

The Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendant, his agents, servants, employees, attorneys, and those in active concert or participation with Defendant, who receive actual notice by personal service or otherwise, from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder.

### II.

Order Defendant to disgorge an amount equal to the funds and benefits he obtained illegally as a result of the violations alleged herein ($298,917), plus prejudgment interest on that amount ($54,020), but waive the payment of all disgorgement and all prejudgment interest based upon Defendant's inability to pay as evidenced by his sworn financial statements and other materials provided to the SEC.

### III.

Order all additional relief to which the Commission may be entitled.

Respectfully submitted,

February 21, 2014

Mark J. Yost
Securities and Exchange Commission
100 F. Street, N.E.
Washington, DC 20549
(202)551-4903
yostm@sec.gov

## CERTIFICATE OF SERVICE

   I hereby certify that a copy of the foregoing was served by e-mail and ordinary U.S. Mail, postage pre-paid, to the following party, this 21st day of February, 2014:

Dennis J. Concilla, Esq.
Carlile Patchen & Murphy LLP
366 E. Broad St.
Columbus, Ohio 43215
Dconcilla@cpmlaw.com

                     _____
                     Mark J. Yost
                     Division of Enforcement
                     U.S. Securities and Exchange Commission